UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Josefina Becerra Hernandez, individually and as Trustee for the estate of Felipe Ledesma Cruz, deceased, and for Rebecca Ledesma Becerra,

Civil File No. 01-183 (PAM/RLE)

Plaintiff,

v.

**MEMORANDUM AND ORDER**

Terry Alan Flor, Central Landscaping, Inc., Central Turf Farms, and Champion Home Builders Co.,

Defendants.

---

This case arises from a mobile home fire. Plaintiff Josefina Becerra Hernandez's husband, Pelipe Cruz, was killed in that fire. Accordingly, Hernandez has filed claims against the owner of the mobile home, Defendant Terry Alan Flor, and Cruz's employer, Defendant Central Turf Farms ("Central Turf"), for negligence and violations of the Migrant and Seasonal Agricultural Worker Protection Act ("AWAP"), 29 U.S.C. § 1801 et seq. Additionally, Hernandez has filed products liability claims against the manufacturer of the mobile home, Defendant Champion Home Builders Co. ("Champion"). Currently pending before the Court are: (1) Hernandez's Motion for Partial Summary Judgment Against Flor

FILED NOV 2 7 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

and Central Turf; (2) Central Turf and Central Landscaping, Inc.'s cross-Motion for Summary Judgment against Hernandez;[1] (3) Champion's Motion to Exclude Expert Testimony and for Summary Judgment; and (4) Hernandez's Motion to Exclude Champion's Experts. For the following reasons, the Court grants in part and denies in part Hernandez's Motion for Partial Summary Judgment Against Flor and Central Turf, grants in part and denies in part Central Turf's cross-Motion for Summary Judgment against Hernandez, grants in part and denies in part Champion's Motion to Exclude Expert Testimony and for Summary Judgment, and denies Hernandez's Motion to Exclude Champion's Expert testimony.

**BACKGROUND**

On July 9, 1999, at approximately 4:00 a.m., Josefina Becerra Hernandez's husband, Felipe Cruz, died in a mobile home fire. Cruz was a migrant worker who lived in this mobile home with six other migrant workers. Although these six other workers escaped from the home on the morning of July 9, Cruz was trapped in the north bedroom by the fire. Several minutes after the six workers escaped, the fire engulfed the mobile home.

---

[1] Hernandez has not responded to Central Landscaping, Inc.'s Motion for Summary Judgment. Instead, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, she requests additional time to conduct discovery regarding Central Landscaping, Inc.'s potential involvement in this case. Under Rule 56(f), a party must establish "what specific facts further discovery might unveil." Stanback v. Best Diversified Prods., Inc., 180 F.3d 903, 911 (8th Cir. 1999) (quoting Dulany v. Carnahan, 132 F.3d 1234, 1238 (8th Cir. 1997)). Hernandez has not suggested what facts she believes might be unveiled through further discovery. Rather, she frames her request for additional discovery in general terms. In the absence of a particularized showing, the Court denies her request and grants Central Landscaping, Inc.'s Motion for Summary Judgment. Thus, the Court will not address Hernandez's claims against Central Landscaping, Inc. in the remainder of this Order.

Cruz and the other migrant workers were hired by Central Turf in the spring of 1999. Central Turf is a family-owned partnership located in North Branch, Minnesota that grows and sells sod. Starting in 1994, Central Turf employed migrant workers between mid-April and mid-November each year. Central Turf sought rental housing for them from Terry Alan Flor, the owner of two mobile homes and manager of the trailer park where the mobile homes were located.[2]

Initially, Flor was hesitant about dealing directly with the migrant workers, in part, because he feared that they would not pay the rent. Accordingly, Flor entered into an oral agreement with Central Turf providing that Central Turf would deduct the rent from the migrant workers' paychecks and then pay him on their behalf. Based on this agreement, Central Turf contends that it was nothing more than a conduit for the rent.

Hernandez, on the other hand, claims that Central Turf was actually renting the mobile home from Flor and then subletting the home to the migrant workers. To support her claim, Hernandez points out that Central Turf was responsible for paying not only the rent, but also the utilities. (See Flor Dep. at 39-40.) Hernandez also alleges that Central Turf controlled the amount of rent paid by the migrant workers and often deducted more in rent from the migrant workers' paychecks than it would pay to Flor. (See id. at 66-67.) Additionally, Hernandez claims that Central Turf referred to the mobile home as its trailer and directed migrant workers to the mobile home if they needed housing. (See id. at 41.) Finally,

[2] Flor's duties as manager of the trailer park ended eight days before the fire.

Hernandez asserts that the migrant workers looked to Central Turf to perform routine maintenance work on the home and its appliances. Whatever the truth of these allegations, it is undisputed that Central Turf was responsible for preparing the mobile home in the spring and winterizing it in the fall. (See id. at 38-41.) Central Turf also performed some maintenance and repair work on the home while the migrant workers occupied it, including plumbing, floor repair, and roof repair. (See id. at 84-85; F. Halley Dep. at 24-25.)

Not surprisingly, Central Turf argues that none of these allegations or facts evidence that it was leasing or otherwise exercising control over the mobile home. Central Turf maintains that the migrant workers occupying the mobile home considered Flor to be their landlord and to be responsible for making any repairs to the home or its appliances. (See Cardenas Aff. ¶¶ 4-7; Robles Aff. ¶¶ 4-7.) According to Central Turf, all of the maintenance work that it performed on the mobile home was done at Flor's request and was paid for by Flor. Flor also patrolled the trailer park on at least one occasion and told the migrant workers living in the mobile home to pick up beer bottles on the home's lot. (See Flor Dep. at 104.) Finally, Central Turf notes that Flor was free to rent the mobile home to other tenants during the winter months when the migrant workers were not occupying it.

Regardless of who was actually in control of the mobile home, Hernandez claims that the only smoke detector in the home was located on the east wall in the kitchen. However, there was no sound from this smoke detector on the morning of July 9. (See Hanson Aff. Ex. B.) Flor testified that he did not test the smoke detector prior to the fire in 1999. (Flor Dep.

at 45.) Likewise, two representatives of Central Turf testified that it never tried to determine if there was a smoke detector in the mobile home and never tested any smoke detector that was in the home to ensure that it was operational. (F. Halley Dep. 46-47; E. Halley Dep. 46-47.) Hernandez claims that both Flor and Central Turf were responsible under Minnesota and federal law for ensuring that the smoke detector was operational and for installing additional detectors.

Flor did not respond to these allegations in writing, but he appeared at the oral hearing in this matter and essentially argued that Central Turf was in control of the mobile home. Central Turf's control, he suggested, makes it exclusively liable for any damages to which Hernandez may be entitled. Additionally, Flor maintained that he could not be held liable because he provided housing to the general public and to the migrant workers on the same terms.

Central Turf also denies liability. It ascribes much importance to the fact that it was not the owner of the mobile home. Additionally, Central Turf maintains that it did not exercise the requisite control over the mobile home to be held liable for any violations of state or federal law.

In addition to bringing claims against Flor and Central Turf, Hernandez claims that Champion, the manufacturer of the mobile home, constructed the home in an unreasonably dangerous manner. Hernandez's expert, Erik Anderson, asserts that the fire originated in an exhaust fan above the kitchen stove in the mobile home. According to Anderson, the fire

resulted from electrical faulting in the fan's wiring. Pointing to the testimony of the production manager at the plant where the mobile at issue was manufactured, Hernandez argues that the range hood exhaust fan was likely an original appliance. (See Arent Dep. at 60-61.) Accordingly, Hernandez claims that Champion is responsible for installing the allegedly defective exhaust fan.

Hernandez also argues that Champion constructed the mobile home out of unreasonably flammable building materials, including lauan plywood, which allowed the fire to rapidly spread. Hernandez's expert, Dr. Robert Williamson, opines that "rapid fire spread on the interior finish of the structure was a substantial factor in the death of Mr. Cruz." (See Stefonowicz Aff. Ex. I at 4.) Dr. Williamson further avers that Champion had the knowledge and technical ability to build a mobile home utilizing less flammable materials. At the very least, Hernandez argues, Champion should have provided warnings about the dangers of the building materials used.

Finally, Hernandez claims that Champion constructed the home with windows in the bedroom where Cruz was killed that were unreasonably dangerous. Hernandez asserts that these windows were "crank-out" windows that did not allow Cruz to escape on the morning of the fire. Hernandez offers only the testimony of one of the home's previous owners to support her claim that the windows in Cruz's bedroom were "crank-out" windows. (See Dahlin Dep. 43-45.)

Champion responds to these claims by first arguing that Hernandez's experts failed

to conduct any testing specific to this case. According to Champion, their opinions are therefore mere speculation and should be excluded. In the absence of expert testimony, Champion asserts that Hernandez cannot establish that the range hood exhaust fan or the building materials used in the mobile home were defective or caused her claimed injury.

Alternatively, Champion argues that there is no evidence that the mobile home or the range hood exhaust fan were defective at the time that the home left Champion's control. Champion points out that, at the time of its construction in 1974, the mobile home complied with all applicable codes and regulations, and it received certification from the Mobile Homes Manufacturing Association and a Seal of Approval from the State of Minnesota. (See id. Ex. F.) Additionally, Champion maintains that it is unlikely that the range hood exhaust fan alleged to have started the fire was installed by Champion. The original invoice for the mobile home references a "range hood w/ light," but makes no explicit mention of a range hood fan. (See id.) Indeed, one of the mobile home's previous owners, James Dahlin, testified that he did not specifically recall the range hood having a fan. (Dahlin Dep. at 8.) It is also noteworthy that the mobile home appeared to have two vents into the kitchen, one through the ceiling and one through the side wall. (See Arent Dep. 57-64.) Champion, however, claims that it did not manufacture mobile homes with two vents. (Id.)

Champion also emphasizes that the mobile home was altered in several material ways between the time of its manufacture and 1999. According to Champion, these substantial modifications should relieve it from liability for the fire. In particular, at some point between

1994 and 1995, Dahlin removed and replaced the wall and ceiling panels in the bedroom where Cruz died. (Dahlin Dep. at 34-35, 64-65.) Dahlin has testified that he replaced the wall panels with "cheaper material" but that he replaced the ceiling panels with the same type of panels as those used by Champion. (See id. at 9-10, 34-35.) Dahlin also replaced the lower cabinets in the kitchen. (See id. at 25-26.) Then, after receiving possession of the home, Flor attached a two-bedroom addition to it. (See Flor Dep. at 57.) Although Flor is not an electrician, he wired this addition to the home for electricity. (See id. at 58.) Flor also added a door to the mobile home and replaced the bathroom floor. (See id. at 54-57, 84.) Finally, Flor or some other previous owner added a second electrical breaker box to the mobile home. (See Arent Dep. at 114.)

Lastly, with regard to the windows in Cruz's bedroom, Champion points out that the remains of the mobile home were examined after the fire, and one of its investigators, James Syvertsen, determined that the windows were horizontal sliding windows. (Syvertsen Aff. ¶¶ 6, 8.)

**DISCUSSION**

**A. Summary Judgment Standard**

Summary judgment is only proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The Court must view the evidence and the

inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). Nevertheless, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enter. Bank, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**B. Claims against Central Turf and Flor**

The basis for all of Hernandez's claims against Flor and Central Turf is that the mobile home at issue had only one inoperable smoke detector. Neither Flor or Central Turf contest this fact. Accordingly, for the purposes of these Motions, the Court finds that there was only one smoke detector in the mobile home on the morning of July 9, 1999, and this detector was not operating. Hernandez first claims that Flor and Central Turf negligently

failed to maintain this smoke detector. Next, Hernandez argues that Flor's and Central Turf's failure to maintain the smoke detector, as well as install additional detectors, violated the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801, et seq., requiring that owners and persons in control of migrant workers' housing comply with state and federal safety laws.

### 1. Negligence Claims

To prevail on her negligence claims against Flor and Central Turf, Hernandez must establish that: (1) Flor and Central Turf had a duty to inspect and maintain the smoke detector; (2) Flor and Central Turf breached this duty; (3) the breach was the proximate cause of Cruz's death; and (4) Hernandez has been damaged by Cruz's death. See Nickelson v. Mall of Am. Co., 593 N.W.2d 723, 725 (Minn. Ct. App. 1999). Both Flor and Central Turf maintain that they had no duty to inspect or maintain the smoke detector.

Determining whether a duty exists is a question of law for the Court. Id. at 726; Banovetz v. King, 66 F. Supp. 2d 1076, 1080 (D. Minn. 1999). A legal duty may be imposed by a statute or by common law. Doe v. Brainerd Int'l Raceway, Inc., 533 N.W.2d 617, 620 (Minn. 1995). Here, Hernandez argues that Flor and Central Turf were under a statutory duty to inspect the smoke detector. Alternatively, Hernandez argues that the common law imposes such a duty on them.

#### a. Statutory Duty

In Minnesota, negligence per se exists if a defendant violates a statute and: (1) the

statute imposes a standard of conduct designed to protect the person or persons injured; (2) the harm suffered is of the type that the statute was intended to prevent; and (3) the statute does not explicitly designate that its breach is only prima facie evidence of negligence. Alderman's Inc. v. Shanks, 536 N.W.2d 4, 8 (Minn. 1995) (citing Pac. Indem. Co. v. Thompson-Yaeger, Inc., 260 N.W.2d 548, 558-59 (Minn. 1977) and Bulter v. Engel, 68 N.W.2d 226, 230 (1954)). Hernandez alleges that Flor and Central Turf violated section 299F.362 of the Minnesota Statutes, providing that dwellings, such as mobile homes, must be equipped with smoke detectors as required by rules promulgated by the Commissioner of Public Safety. Minn. Stat. § 299F.362, subds. 2-3. "For all occupancies covered by this section where the occupant is not the owner of the dwelling unit . . ., the owner is responsible for maintenance of the smoke detectors." Minn. Stat. § 299F.362, subd. 5.

It is obvious that section 299F.362 was enacted to protect occupants of dwelling units, such as Cruz, from the hazards of fire by ensuring that smoke detectors are maintained by the owner of the dwelling. Because Cruz died in a fire, it is fair to say that the harm suffered in this case is the sort of harm that the legislature hoped to prevent. Finally, there is nothing in section 299F.362 to suggest that a breach of its provisions should only constitute prima facie evidence of negligence. Thus, any violation of section 299F.362 in this case constitutes negligence per se.

Because Flor owned the mobile home, he was under a duty to maintain the smoke detector pursuant to section 299F.362. Flor argues that he should not be held liable for a

violation of section 299F.362 because he did not exercise control over the mobile home. This argument, however, ignores the unequivocal language of the statute, which establishes no exception to the duty of owners to maintain smoke detectors. Because Flor testified that he did not inspect or otherwise maintain the smoke detector in the mobile home at issue, the Court finds that, as a matter of law, Flor was negligent per se for failing to maintain the smoke detector. Nevertheless, Hernandez must still establish at trial that Flor's negligence caused her damages. See Alderman's Inc., 536 N.W.2d at 8 n.6 (stating that after a defendant's negligence has been conclusively determined, the jury must determine if the negligence caused the plaintiff's harm).

Central Turf, however, was not the owner of the mobile home. Apparently realizing that on its face section 299F.362 applies only to owners, Hernandez essentially argues that the statute is applicable to Central Turf through another statute, providing in pertinent part that "the landlord or licensor covenants . . . to maintain the premises in compliance with the applicable health and safety laws of the state." Minn. Stat. § 504B.161, subd. 1(3). A "landlord" is defined as "an owner of real property, a contract for deed vendee, receiver, executor, trustee, lessee, agent, or other person directly or indirectly in control of rental property." Minn. Stat. § 504B.001, subd. 7. According to Hernandez, Central Turf was actually the lessee of and exercised direct, or at least indirect, control over the mobile home. This control, Hernandez maintains, obligates Central Turf to comply with all safety laws of the state including section 299F.362.

Central Turf responds by arguing that the plain text of section 299F.362 evidences that the Minnesota legislature intended to make only owners responsible under the statute. See State v. Fearon, 166 N.W.2d 720, 723 (Minn. 1969) (stating that words used in a statute should be given their ordinary meaning absent evidence that the legislature intended to adopt a particular meaning). Although there is no Minnesota case construing the term "owner" in section 299F.362, Central Turf cites an Illinois case discussing the definition of the term "owner" in a substantially similar Illinois statute. See Sandstrom v. De Silva, 645 N.E.2d. 345 (Ill. App. Ct. 1994).

In Sandstrom, the plaintiff was suing a town home owner and the town home association for the death of an overnight guest in a fire. The plaintiff alleged that the town home did not have an operable smoke detector as required by Illinois law and that the association was responsible. To underpin its decision that the association was not responsible under the applicable statute because it was not an "owner," the court noted that the statute explicitly distinguished between an owner and a tenant, demonstrating the legislature's intent to define "owner" narrowly. Id. at 347-48. Central Turf asserts that the reasoning of the Illinois court is sound and that the term "owner" in section 299F.362 should likewise be construed narrowly.

The Court agrees. The Minnesota legislature contemplated in subdivision 5 of section 299F.362, that the statute might apply to rental properties. Subdivision 5 distinguishes between occupants and owners but does not create any further distinctions. Although sound

public policy justifications for holding landlords as well as owners responsible for the maintenance of smoke detectors could be articulated, it is beyond the province of this Court to rewrite the statute. Thus, even if Central Turf was the migrant workers' landlord, it cannot be held negligent per se for failing to maintain the smoke detector in the mobile home pursuant to section 299F.362.

b. Common Law Duty

Generally, the existence of a common law duty depends "on the relationship of the parties[,] the foreseeable risk involved," and "ultimately, the question is one of policy." Banovetz, 66 F.Supp. 2d at 1080 (quoting Erickson v. Curtis Inv. Co., 447 N.W.2d 165, 168-69 (Minn. 1989)). In the context of real property, the degree of control exercised by the defendant over the property is a fundamental consideration in determining whether the defendant was under a duty. Hernandez argues that even if Central Turf is not negligent per se, it was under a duty to inspect and maintain the smoke detector in the mobile home at issue because it exercised substantial control over the home and it was reasonably foreseeable that an inoperable smoke detector could result in the death of one or more of the home's occupants.

Central Turf retorts that Flor, not it, was in control of the mobile home. This argument is spurious. Control is not a binary concept. The Court is convinced that more than one person or party may exercise the requisite control over real property to be held negligent for failing to properly maintain or inspect that property.

Citing Lucas v. George T.R. Murai Farms, Inc., 19 Cal. Rptr. 2d 436 (Cal. Ct. App. 1993), Central Turf also argues that the migrant workers living in the mobile home did not rely on Central Turf to manage, administer, or oversee the home. Accordingly, Central Turf contends that, as a matter of law, it did not have a duty to inspect or maintain the mobile home or its smoke detector.

In Lucas, several migrant workers were living on undeveloped land, known as the cancha, near the defendant's ranch. Id. at 437. Although the defendants did not own the cancha, they told the workers living there to pick up trash. Id. at 442. Additionally, a security company hired to patrol the defendants' ranch also informally patrolled and regulated the activities of the migrant workers living in the cancha. Id. at 438. Following a fire in the cancha which burned the plaintiff and killed another migrant worker, the plaintiff filed suit against the defendants on various tort theories. The plaintiff argued that the defendants assumed a duty to provide safe housing and safe conditions because they managed or administered the cancha. Id. at 439. The court ruled that the migrant workers did not rely on the actions of the defendants and, therefore, that those actions did not constitute control over the cancha. Id. at 442-43. Accordingly, the court upheld a grant of summary judgment in favor of the defendants. Id. at 443. Here, Central Turf contends that it did even less than the defendants in Lucas. It did not, for instance, patrol or hire others to patrol the trailer park, and it did not regulate the migrant workers' activities in the trailer park.

Without passing on the merits of the decision in Lucas, it is apparent that there are notable distinctions between it and the instant case. Perhaps most importantly, the court in Lucas was faced with a situation in which migrant workers built their own shelters out of unsafe scraps and then used candles for lighting in these shelters. Thus, the Lucas court's holding is predicated on the notion that, because the defendants did not own the property on which the migrant workers were housed, "it makes no sense to impose a duty [on them] to protect the plaintiffs from the consequences of their own activity." Id.

Here, Central Turf sought out and, at least in some sense, provided housing to Cruz and the other migrant workers. Central Turf prepared this housing for the migrant workers in the spring, shut it down in the winter, and performed some maintenance work on this housing while the migrant workers occupied it. Additionally, evidence has been adduced suggesting that Central Turf may have been deducting more for rent from the migrant workers' paychecks than it was paying to Flor, thereby reaping a financial benefit from the rental. Although these facts do not, as Hernandez argues, establish that Central Turf is liable for negligence as a matter of law, there are genuine issues of material fact regarding whether Central Turf exercised sufficient control over the mobile home to have assumed a duty to inspect or maintain the smoke detector in the home. Accordingly, both Hernandez's and Central Turf's Motions for Summary Judgment on this issue are denied. Hernandez may proceed to trial on her negligence claim against Central Turf.

### 2. Violation of the AWPA

In addition to alleging that Flor and Central Turf violated state law, Hernandez claims that they failed to comply with the mandates of the AWAP. The AWAP provides in pertinent part that "each person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing." 29 U.S.C. § 1823(a).[3] According to federal regulations, a person or entity controls housing if they are "in charge of or have the authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee." 29 C.F.R. § 500.130(c).

Hernandez asserts that both Flor and Central Turf were obligated, through the AWAP, to comply with a host of federal and state housing standards regulating the installation and maintenance of smoke detectors, including section 299F.362 of the Minnesota Statutes. Rather than arguing about whether the federal and state housing standards that Hernandez cites are applicable, Flor and Central Turf contend that the AWAP does not apply to them. For the purposes of the pending Motions, then, the Court assumes that the federal and state housing standards cited by Hernandez are apposite to this case.

---

[3] Although Flor and Central Turf argue that they should not be held liable under the AWAP because the other party exercised control over the mobile home, liability under the AWAP may attach to each party that has ownership or control of the housing. See 29 C.F.R. § 500.130(a) ("If more than one person is involved in providing the housing . . . both persons are responsible for ensuring that the facility or real property meets the applicable Federal and State housing standards.").

For his part, Flor argues that he was not bound by the mandates of the AWAP because he "regularly provide[d] housing on a commercial basis to the general public and . . . provide[d] housing to migrant agricultural workers of the same character and on the same or comparable terms and conditions as [he] provided to the general public." 29 U.S.C. § 1823(c). Flor testified in his deposition that he rented one of his mobile homes to local families from 1991 until 1994. (Flor Dep. at 17-18.) Furthermore, he testified that he began to rent one of his mobile homes directly to a group of Central Turf's former workers who decided to take different jobs and stay in the North Branch area. (Flor Dep. at 118-120.)

Flor's testimony is notably bereft of any details about the frequency and terms and conditions of the rental arrangements made with these other tenants. Nevertheless, his testimony suffices to create a genuine issue of material fact as to whether he regularly provided housing to the general public and the migrant workers on similar terms. The Court therefore denies Hernandez's Motion for partial summary judgment against Flor.

Central Turf asserts that the AWAP does not apply to it because it was not the owner of and did not exercise the requisite control over the mobile home at issue. This argument overlooks the remedial nature of the AWAP, a statute enacted in response to the exploitative practices that historically plagued the migrant agricultural labor market. See Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1505 (11th Cir. 1993); Howard v. Malcolm, 629 F. Supp. 952, 954-55 (E.D.N.C. 1986) (stating that all the definitions and provisions contained in the AWAP are to be given expansive interpretation). Congress intended that

the term "control" be interpreted "with the broadest possible meaning to ensure that the person who owns or controls the facility used as housing . . . is responsible for maintaining that facility." H.R. Rep. No. 97-885, at 17-18 (1982), reprinted in 1982 U.S.C.C.A.N. 4563, 4564. Indeed, "[t]he disjunctive phrase–'authority to oversee, manage, superintend or administer' housing–sweeps in more activities than those traditionally relegated to a landlord." Castillo v. Case Farms of Ohio, Inc., 96 F. Supp. 2d 578, 614 (W.D. Tex. 1999). Giving "control" a broad definition and bearing in mind underlying humanitarian purposes of the statute, the Court determines that even a slight factual dispute regarding whether a person or entity controls housing for the purposes of the AWAP is sufficient to survive summary judgment.

In this case, however, there is more than a slight factual dispute. There are substantial issues of fact regarding whether Central Turf oversaw, managed, or administered the mobile home by preparing it in the spring, performing regular maintenance on it, and winterizing it in the fall, after the migrant workers left. There are also questions of fact regarding the extent to which the workers in the home looked to Central Turf to repair the home or its appliances. Finally, there is a genuine issue of material fact as to whether Central Turf collected more for rent from Cruz and the other migrant workers than it paid to Flor. These factual disputes are at the heart of the inquiry into the nature and extent of control, either directly or indirectly, that Central Turf had over the mobile home. Thus, summary judgment is an inappropriate means of resolving this issue, either in favor of Hernandez or Central

Turf, and the Court denies both parties' Motions.

### C. Claims against Champion

Although Hernandez's claims against Champion are not clearly articulated, it appears that she is asserting products liability claims against it for: (1) installing a defective exhaust fan in the kitchen; (2) constructing the mobile home out of unreasonably flammable building materials, including lauan plywood; and (3) installing crank-out style windows in the bedroom where Cruz was killed that unreasonably prevented Cruz from escaping on the morning of the fire.[4] Additionally, Hernandez asserts that Champion is liable for failing to provide warnings about the allegedly flammable building materials used in the mobile home.

#### 1. Products Liability Claims

To establish a products liability claim, a plaintiff must show that: (1) the product was in a defective condition, unreasonably dangerous to the user; (2) the defect existed at the time that the product left the manufacturer's control; and (3) the defect caused the plaintiff damage. Bilotta v. Kelley Co., 346 N.W.2d 616, 623 n.3 (Minn. 1984); Westbrock v. Marshalltown Mfg. Co., 473 N.W.2d 352, 356 (Minn. Ct. App. 1991). Not surprisingly the

---

[4] Neither party carefully addresses Hernandez's claim that the mobile home was unreasonably dangerous because it was manufactured with "crank-out" windows in the bedroom where Cruz died. Although Champion argues that there is strong evidence to suggest that the bedroom did not have "crank-out" windows, this issue is not amenable to resolution on summary judgment because Hernandez has offered the contradictory testimony of a former owner of the mobile home. Because neither party asserts that expert testimony is required to establish the relative dangerousness of the type of windows installed in a bedroom, the Court denies without further consideration Champion's Motion for Summary Judgment on this claim.

most difficult aspects of establishing a products liability claim are proving that the product was defective and caused the plaintiff damage. Lee v. Crookston Coca-Cola Bottling Co., 188 N.W.2d 426, 432 (Minn. 1971). "[T]he mere fact of injury during the use of the product usually is insufficient proof to show existence of a defect at the time that defendant relinquished control." Id. Accordingly, expert testimony is often necessary to create a fact question for the jury regarding the existence of a defect and the cause of the injury. See Mozes v. Medtronic, Inc., 14 F. Supp. 2d 1124, 1128 (D. Minn. 1998) (stating that expert testimony is needed if "the acts or omissions complained of are [outside] of the ordinary knowledge and experience of lay persons" (quoting Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co., 366 N.W.2d 271, 279 (Minn. 1958))).

In this case, the installation and wiring of kitchen exhaust fans and the flammability of particular building materials are not issues within the ken of ordinary lay persons. Thus, the Court finds that Hernandez must prove her products liability claims with expert testimony. Recognizing this, Champion makes a threshold Motion in Limine to exclude the testimony of Hernandez's proffered experts for failing to comply with the mandates of Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993). Alternatively, Champion argues that Hernandez cannot show that the mobile home was in a defective condition at the time it left Champion's control.

a. Champion's Motions to Exclude Expert Testimony

Expert testimony is only admissible under Rule 702 if it is relevant and reliable.

Daubert, 509 U.S. at 595; see also Peitzmeier v. Hennessy Ind., Inc., 97 F.3d 293, 296-97 (8th Cir. 1996) (noting that it is incumbent on the Court to "act as a gatekeeper in screening [proffered expert] testimony"). Expert evidence is relevant if it helps "the trier of fact to . . . determine a fact in issue." Daubert, 509 U.S. at 591. For expert evidence to be relevant, in other words, there must be, "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92. Expert testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592. As the Seventh Circuit has noted, however, an expert's opinion must not only be rooted in legitimate science, but the methodologies and techniques employed by the expert must be genuinely scientific. See Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318-19 (7th Cir. 1996) (stating that "the courtroom is not the place for scientific guesswork, even of the inspired sort"); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 156-57 (1999) (stating that even if an expert has used a scientifically valid theory or technique, that expert's testimony is inadmissible if the expert has inappropriately applied or adapted the theory).

Ultimately, the goal of the trial court's gate-keeping function is to ensure "that when [experts] testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." Rosen, 78 F.3d at 318. The personal opinion of an expert witness, no matter how impressive his or her credentials may be, is inadmissible under Rule 702. See id. (stating that a trial court must "determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine

scientist"). In making the determination about whether an expert's testimony is admissible, courts may consider: (1) whether the expert's hypotheses can be or have been tested; (2) whether the expert's methodology has been subjected to peer review; (3) the rate of error associated with the methodology; and (4) whether the methodology is generally accepted within the scientific community. Daubert, 509 U.S. at 593-94. Courts, however, "must customize [their] inquiry to fit the facts of each particular case." Jaurequi v. Carter Mfg., Inc., 173 F.3d 1076, 1083 (8th Cir. 1999). Additionally, any doubts about the admissibility of expert testimony should be resolved in favor of admission. See Clark v. Heidrick, 150 F.3d 912, 914 (8th Cir. 1998) (citations omitted); Nat'l Bank of Commerce v. Associated Milk Producers, Inc., 191 F.3d 858, 862 (8th Cir. 1999) (citations omitted) (noting that it is not the court's role to weigh the expert testimony).

Champion argues that the testimony of both Erik S. Anderson and Dr. Robert Williamson should be excluded because neither expert has conducted specific experimentation or factual analysis to validate his opinion. Although Champion does not suggest what sort of testing would have made Mr. Anderson's proposed testimony more palatable, it asserts that his opinion that the fire in this case was caused by a malfunction or breakdown of the insulation on wiring inside the range hood exhaust fan and was exacerbated by a build-up of cooking byproducts and grease is mere speculation. Similarly, Champion impugns Dr. Williamson's proposed testimony because he has not conducted some sort of experiment that is particular to the facts in this case. Rather, Dr. Williamson bases his

opinion that the building materials used by Champion were unreasonably flammable and that fire in this case would not have spread as rapidly as it did but for Champion's use of these materials on a 1978 National Bureau of Standards report involving the direct ignition of lauan plywood in a mobile home. The conditions of the testing done in 1978, Champion maintains, are inapposite to the facts of this case.

Champion's complaint that Mr. Anderson has not conducted adequate testing and factual analysis that is specific to this case is disingenuous. Mr. Anderson examined the remains of the mobile home at issue and photographs of those remains. (Anderson Aff. ¶ 2; Stefonowicz Aff. Ex. J at 2.) Additionally, many of Mr. Anderson's conclusions are based on the factual findings contained in the fire investigation reports of Nathan Kreye and Thomas Neudahl. (See Hanson Aff. Ex. B.) Finally, Mr. Anderson has conducted tests involving the ignition of grease and cooking oils generally and has pointed to scientific literature corroborating those tests. (Anderson Aff. ¶¶ 5-10.) Although Champion is free to challenge the accuracy of the fire investigation reports, the assumptions underlying Mr. Anderson's opinion, and ultimately the validity of Mr. Anderson's opinion, the Court finds that Mr. Anderson's testimony is sufficiently rooted in legitimate scientific methods and procedures to satisfy the requirements of Daubert. Accordingly, the Court denies Champion's request to exclude Mr. Anderson's expert testimony.

The Court is more troubled by Dr. Williamson's proposed testimony. Dr. Williamson is prepared to testify that it is his opinion that the materials used for the interior finish of the

mobile home were unreasonably dangerous because of their extreme flammability. He is also prepared to testify that the fire on July 9, 1999, spread more rapidly than it would have but for the use of these dangerous materials. Finally, he is prepared to testify that, but for the use of these dangerous materials, Cruz likely could have escaped on the morning of July 9, 1999.

Champion argues that Dr. Williamson should not be allowed to testify about any of these issues. The Court is convinced, however, that to the extent that Dr. Williamson is prepared to testify about the flammability of the building materials used in the mobile home, his testimony is admissible. Although the Court has doubts about the ultimate persuasiveness of Dr. Williamson's testimony in light of his reliance on a study of lauan plywood conducted under circumstances that are materially different than those of the fire at issue, it is not the province of the Court to weigh the credibility of an expert's testimony. Dr. Williamson's opinion about the flammability of the building materials used in the mobile home is based on sound scientific experimentation. To the extent that the experimentation fails to account for the unique circumstances of this case, Champion is free to refute Dr. Williamson's testimony through cross-examination and the presentation of its own expert testimony. Thus, the Court denies Champion's Motion to exclude Dr. Williamson's testimony insofar as Dr. Williamson is prepared to testify about the general flammability of the building materials used in the mobile home at issue.

To the extent that Dr. Williamson is prepared to testify that the fire on the morning

of July 9, 1999, would not have spread as rapidly as it did but for the use of these allegedly flammable building materials, however, Dr. Williamson's lack of analysis of the particular characteristics of mobile home undermines the validity of his opinion. It is one thing to opine generally about the flammability of a particular type of building material. It is quite another thing to claim that the use of that type of building material in a given case resulted in a more rapidly developing fire. Without consideration of the unique features of the structure that burned, the Court doubts the reliability of Dr. Williamson's testimony about the rapid spread of the fire on July 9. Nevertheless, neither party has addressed this specific issue carefully in their submissions. The Court therefore denies Champion's Motion in Limine without prejudice to the extent that it seeks to exclude Dr. Williamson's proposed testimony dealing with the rapid spread of the fire on July 9, 1999. Champion may raise this issue again before the trial of the case.

Finally, the Court grants Champion's Motion to exclude Dr. Williamson's opinion that, but for the rapid spread of the fire, Cruz could have escaped from the mobile home on the morning of July 9, 1999. There is no scientific underpinning for the conclusion that if Cruz "had only one minute more[,] he probably could have escaped." (Stefonowicz Aff. Ex. I at 4.) Dr. Williamson's testimony on this matter is speculative and conclusory.

b. Defective Condition

Champion argues that Hernandez cannot show that the mobile home at issue was in a defective condition at the time that it left Champion's control. First, Champion contends

that the mobile home complied with all of the safety requirements of the state and received certification from the Mobile Homes Manufacturing Association and a Seal of Approval from the State of Minnesota. Additionally, Champion argues that it is unlikely that the range hood exhaust fan alleged to have started the fire was installed by Champion. Finally, Champion points out that substantial modifications were made to the mobile home, any one of which might have contributed to or caused the fire in this case.

Contrary to Champion's assertions, however, these matters cannot be resolved on a motion for summary judgment. Hernandez has adduced expert evidence suggesting that the range hood exhaust fan in the kitchen of the mobile home was defective. Additionally, Hernandez has provided evidence suggesting that the range hood exhaust fan was original equipment installed at the time of the mobile home's manufacture. In particular, the production manager at the plant where the mobile was manufactured testified that the range hood looked original. (See Arent Dep. at 60-61.) This production manager also testified that the invoice referencing only a "range hood w/ light" would not necessarily have indicated whether the range hood was equipped with a fan. (Id. at 69.) Hernandez has, therefore, created genuine issues of material fact regarding whether the range hood was originally installed by Champion, whether this range hood or its exhaust fan was defective and unreasonably dangerous, and whether the range hood exhaust fan caused the fire at issue.

Similarly, Hernandez has adduced expert evidence suggesting that the original building materials used in the mobile home were unreasonably dangerous because they were

extraordinarily flammable. Thus, summary judgment is an inappropriate means of resolving whether or not the mobile home was in a defective condition unreasonably dangerous to the user at the time that it left Champion's control, and Champion's Motion for Summary Judgment on Hernandez's products liability claims must be denied.

**2. Failure to Warn Claim**

Hernandez also argues that Champion should have provided warnings about the alleged flammability of the building materials used in the mobile home. Hernandez sets forth none of the elements of a failure to warn claim and makes nothing but the conclusory allegation that Champion had a duty to warn.

To establish a failure to warn claim, a plaintiff must show that: (1) there was a duty to warn about the risk in question; (2) the warnings given, if any, were inadequate; and (3) the lack of an adequate warning was the cause of the plaintiff's injuries. Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987). The existence of a duty to warn is a question of law. Id. In Minnesota, manufacturers have a duty to warn users of their products of all the dangers associated with those products of which the manufacturer has actual or constructive knowledge. Mozes, 14 F. Supp. 2d at 1129 (citations omitted).

In this case, although Hernandez makes very little of her failure to warn claim, the Court finds that the claim survives summary judgment. Hernandez has pointed to evidence that suggests Champion had actual or constructive knowledge that the building materials used in the mobile home were highly flammable and therefore potentially dangerous. The

production manager at the plant where the mobile home was manufactured has testified that he personally acquired knowledge about the extreme flammability of the building materials used in the mobile home, including lauan plywood. (See Arent Dep. at 95-96.) Additionally, the production manager has testified that around the time of the mobile home's manufacture, Champion began experimenting with alternative interior finish materials including drywall because of concerns about flammability. (Id. at 89-92.) This testimony evidences that Champion had some knowledge of the potential flammability of the building materials used in the mobile home at issue. Because the risk of a fire in a mobile home is a reasonably foreseeable possibility, the Court finds that there are genuine issues of material fact regarding whether or not Champion had a duty to provide some sort of warning about the flammability of the building materials to finish the interior of the mobile home.

Even if there was such a duty, however, Hernandez must still establish at trial that Champion failed to provide any such warnings or that the warnings it did provide were inadequate. Additionally, Hernandez must show that Champion's failure to provide adequate warnings about the potential dangers associated with interior finish of the mobile home caused her injuries.

### D. Hernandez's Motion to Exclude Champion's Expert Testimony

The last matter pending before the Court is Hernandez's request that the Court exclude the testimony of two of Champion's proposed experts, James Syvertsen and John Pagels. Mr. Syvertsen, a certified fire investigator, is prepared to testify that the fire on July

9, 1999, started in the bathroom of the mobile home rather than the kitchen. Mr. Pagels, an electrical engineer, is prepared to testify that the range hood exhaust fan was not the cause of the fire. Parroting Champion's arguments about the expert testimony of Mr. Anderson and Dr. Williamson, Hernandez asserts that neither Mr. Syvertsen or Mr. Pagels have conducted the requisite factual analysis or testing necessary to validate their opinions. Accordingly, Hernandez claims that their testimony should be excluded under Rule 702 of the Federal Rules of Evidence and Daubert.

Little needs to be said about Hernandez's assertions. Other than disagreeing with their conclusions, she points to no specific failings in either expert's report. Her claim that neither expert conducted rigorous factual analysis in this case is fatuous. Both Mr. Syvertsen and Mr. Pagels examined the remains of the mobile home and photographs of those remains as well as the depositions of witnesses to the fire and related events, and both experts have conducted methodologically sound examinations in this case. To the extent that Hernandez disagrees with the basis for their conclusions or the ultimate validity of those conclusions, she is, of course, free to cross-examine them and present contrary expert testimony. The Court, however, will not exclude their testimony.

**CONCLUSION**

For the foregoing reasons, and upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment Against Defendants Terry

Alan Flor and Central Turf Farms (Clerk Doc. No. 71) is **GRANTED in part and DENIED in part** as follows:

a. Plaintiff's Motion is GRANTED to the extent that it seeks to have the Court find that Defendant Terry Alan Flor was negligent per se in failing to maintain the smoke detector in the mobile home at issue; and

b. In all other respects, Plaintiff's Motion is DENIED;

2. Defendant Central Turf Farm and Central Landscaping, Inc.'s cross-Motion for Summary Judgment against Plaintiff (Clerk Doc. No. 74) is **GRANTED in part and DENIED in part** as follows:

a. Counts I, II, and III of the Second Amended Complaint are **DISMISSED** as they pertain to Defendant Central Landscaping, Inc.;

b. Count II of the Second Amended Complaint is **DISMISSED** as it pertains to Defendant Central Turf Farms; and

c. In all other respects, the cross-Motion is DENIED, and Plaintiff may proceed to trial on Counts I and III of her Second Amended Complaint insofar as they state claims against Defendant Central Turf Farms;

3. Defendant Champion Home Builder Co.'s Motion to Exclude Expert

Testimony and for Summary Judgment against Plaintiff (Clerk Doc. No. 90) is **GRANTED in part and DENIED in part** as follows:

a. Insofar as the Motion seeks to exclude the testimony of Dr. Robert Williamson regarding the likelihood that Felipe Cruz would have escaped on the morning of July 9, 1999, but for the rapid spread of the mobile home fire, it is GRANTED;

b. Insofar as the Motion seeks to exclude the testimony of Dr. Robert Williamson regarding the rapid spread of the fire on July 9, 1999, it is DENIED without prejudice; and

c. In all other respects the Motion is DENIED, and Plaintiff may proceed to trial on Count IV of her Second Amended Complaint; and

4. Plaintiff's Motion in Limine to Exclude Champion Home Builder Co.'s Experts (Clerk Doc. No. 86) is **DENIED.**

Dated: November 27, 2002

Paul A. Magnuson
United States District Court Judge